# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN FRASER, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: |
| | ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| BANK OF AMERICA, N.A. and BAC HOME LOANS SERVICING, LP, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## INTRODUCTION

Plaintiff, individually and on behalf of all other persons similarly situated, hereby alleges the following upon personal knowledge as to herself and upon information and belief as to all other matters based upon the investigation of her attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets. By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

2.　　·Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.　　Bank of America signed a contract with the U.S. Treasury on April 17, 2009 agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period.  Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage

borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

4.      HAMP and its associated directives also set prohibitions against certain conduct including demanding upfront payments in order to be evaluated for a loan modification, instituting or continuing foreclosures while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

5.      Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

6.      Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure.  This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America.  On information and belief, Bank of America does not own a significant majority of the loans on which it functions as a servicer.

7.      Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following:[1]

---

[1]      *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

- Bank of America may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer. Aside from income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

8.      Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States.  Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

9.      In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiff, for temporary loan modifications that must be converted to permanent loan modifications.  Plaintiff and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making payments.  Despite Plaintiff's efforts, Defendant has ignored its contractual obligation to modify her loan permanently.

10.     Because Bank of America is not meeting its contractual obligations, at least hundreds of Missouri homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America. Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are illegal under Missouri law.

11.     Plaintiff Susan Fraser brings this suit on behalf of herself and a Class of similarly situated Missouri residents to challenge the failure of Defendant Bank of America Bank, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover costs and losses incurred as a result.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

13.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that Plaintiff and the members of the Class are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP.  12 U.S.C. § 5201 *et seq.*

14.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of Missouri or otherwise conduct business in the state of Missouri.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, and the named Plaintiff resides in this District.

## PARTIES

16.     Plaintiff Susan Fraser is an individual residing in Troy, Missouri. Plaintiff, as detailed below, has unsuccessfully attempted to secure a permanent loan modification from Defendants, due to Defendants misconduct, and been damaged as a result of this misconduct.

17.     Defendant Bank of America, N.A. is a Delaware corporation with its principle place of business in Charlotte, NC.

18.     Defendant BAC Home Loans Servicing, LP ("BAC"), formerly doing business as Countrywide Home Loans Servicing, LP ("Countrywide"), is a Texas limited partnership with its principle place of business located in Calabasas, CA.  BAC is a subsidiary of Bank of America, N.A., and the two Defendants are collectively referred to as "Bank of America."  Bank of America currently does business and maintains branch offices throughout the State of Missouri.

19.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of Missouri or otherwise conduct business in the state of Missouri.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

21.     Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

> All Missouri homeowners whose loans have been serviced
> by one or both Defendants and who have requested or been
> otherwise eligible for a modification under the terms of
> HAMP Program Documentation and whose loan Bank of
> America has not permanently modified either because
> Bank of America has not offered them a TPP, because they

did not receive a permanent loan modification after they complied with their obligations under HAMP as conveyed to them by Bank of America, as required by HAMP, or because Bank of America has not honored the terms of a permanent modification agreement.

22.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former employees, officers, directors, agents, representatives, their family members, the members of this Court and its staff.

23.     Plaintiff does not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants. Plaintiff believes that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

24.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

25.     All members of the Class have been subject to and affected by the same conduct.  The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

a.      The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

b.      Whether Bank of America breached its duties under HAMP that were intended for the benefit of Plaintiff and members of the Class;

c.    Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

d.    Whether Bank of America's receipt of an executed loan modification agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Bank of America to offer Plaintiff and members of the Class a permanent HAMP modification;

e.    Whether Bank of America's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

f.    Whether Bank of America demanded and collected initial payments from eligible homeowners in violation of HAMP provisions;

g.    Whether Bank of America's written representations to homeowners stating that they would receive permanent loan modifications upon successful completion of the trial period and then failing to deliver such permanent modification constitutes an unfair or deceptive practice under the Missouri Merchandising Practices Act, Missouri Revised Statutes, Chapter 407;

j.    Whether the above practices caused Plaintiff and members of the Class to suffer injury; and

k.    The proper measure of damages and the appropriate injunctive relief.

26.     The claims of the individual named Plaintiff are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that Plaintiff and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

27.     The individual named Plaintiff will fairly and adequately represent the interests of the Class.  She is committed to the vigorous prosecution of the Class's claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

28.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

29.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

30.     Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## FACTS

**A.     The Foreclosure Crisis**

31.     Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

---

[2]     Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report100909-cop.cfin.

10

32.     Missouri, like other states in the country, has been hard hit by the housing crisis. The number of total Missouri properties with foreclosure filings in 2009 was 28,519.[3] As one researcher noted, "Missouri's foreclosure rate is at historically high levels and will probably remain there for at least several years. Research shows that minority and urban core areas in Missouri have suffered the highest rates of foreclosure but more recently many outlying suburban areas have been hit with equally high rates of foreclosure."[4]

33.     Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

**B.     Creation of the Home Affordable Modification Program**

34.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A § 5201 *et seq.* (2009).

35.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." *Id.*

---

[3]     RealtyTrac 2009 Year-End Report, released January 14, 2010.

[4]     *Foreclosures in Missouri: Causes, Consequences, and Solutions,* Todd Swanstrom, E. Desmond Lee Professor of Community Collaboration and Public Policy Administration, University of Missouri – St. Louis, June 30, 2010

36.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.  *Id.*

37.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

38.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

39.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id.*

40.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

41.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

42.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

43.     The second subprogram relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.

44.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

### C.     Duties of a Participating Servicer Under HAMP

45.     Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government.

46.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."[5]

47.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4

---

[5]     The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01,"), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview,") and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS,") and Supplemental Directive 09-08 ("SD 09-08,"). These documents together describe the basic activities required under HAMP.

million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."

48.     The Program Documentation requires Participating Servicers to evaluate *all loans* which are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification.

49.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[6]

50.     A mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met.  Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

---

[6]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in the Program Documentation.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

51.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions."

52.     Once the participating servicer has determined a mortgage borrower's eligibility in the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).

53.     After applying the enumerated modification steps to calculate the modified payment amount, a servicer must offer the borrower a TPP. The TPP consists of a three-month period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. Bank of America uses a standard form agreement to offer TPPs to eligible homeowners. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

54.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification. The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP. Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate

mortgage loans on the date the modification is prepared. Once capped, the rate is fixed for the remainder of the term.

55.    HAMP prohibits a participating servicer from taking several actions including the following:

- Proceeding with a foreclosure sale. Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options.

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts.

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period.

- Reporting borrowers as delinquent to credit reporting bureaus without explanation. For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period. For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status.

- Assessing prepayment penalties for full or partial prepayment as part of the modification.

56.    The HAMP requires a participating servicer to send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation.

57.     The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter.  HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

58.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.

59.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.

60.     Bank of America has routinely failed to meet its obligations under the SPA and the Program Directives.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information. Borrowers who attempt to contact Bank of America by telephone face long periods of

time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call. Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

61.     Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners. In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods have been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.

62.     Bank of America is not complying with HAMP in a manner that can only be considered deliberate. Bank of America's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, Bank of America has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

63.     Bank of America commonly uses a delay tactic of encouraging or even requiring homeowners to resubmit financial information each time the customer calls in to inquire about a pending modification. Any change in financial information – even a small change – then causes Bank of America to restart the application process under the pretext of changed factual information.

64.     Bank of America customer service representatives are instructed to mislead homeowners who call to inquire about loan modifications for which they have applied. Bank of America customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received. Similarly, homeowners are regularly

told that documents were sent on a particular date when, in fact, they had not been sent at all.

65.     Bank of America regularly ignores completed loan modifications by not properly reflecting the modification in its computer system.  Bank of America continues to treat the loan as delinquent by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings.

66.     Bank of America regularly fails to properly credit payments homeowners make under a Trial Payment Plan.  Bank of America commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial plan to be insufficient.  Bank of America's regular practice is to place payments a homeowner makes into a suspense account or "partial payment balance account" and not to credit the homeowner's regular mortgage account.  This results in Bank of America treating a homeowner who has made timely payments under a Trial Plan as delinquent.

67.     Bank of America does not employ the "waterfall" method mandated by HAMP.  In addition, Bank of America has manipulated homeowners' financial records in its computer system to the homeowners' detriment.

68.     Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, Bank of America's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit.

69.     The vast majority of homeowners who seek a HAMP modification with Bank of America do not ever receive a permanently modified loan but are instead delayed indefinitely.

70.     By failing to live up to the TPP Agreement, failing to convert TPPs into permanent modifications and otherwise improperly handling consumers request to

modify their home loan pursuant to HAMP, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

71.     Bank of America's actions are damaging, among other things, to the credit scores and other credit information of Plaintiff and the members of the Class, hurting Class members' ability to engage in other financial transactions because of negative marks on their credit reports.

### D.     Plaintiff's Effort to Obtain a Loan Modification

72.     Plaintiff Susan Fraser purchased her home in 1999 (with her ex-husband) in which she lives with her five children as their primary residence. After her divorce in 2008, the mortgage loan and title to the property were transferred solely to Ms. Fraser's name. Her mortgage was transferred to Bank of America via Countrywide. The loan has carried a fixed interest rate over the life of the mortgage, although the rate has changed through several refinancings.

73.     Ms. Fraser is an employee of Enterprise Holdings. In late 2007 and early 2008, Ms. Fraser's income dropped dramatically as a result of a slowdown in her company's business. Ms. Fraser's divorce was finalized in the spring of 2008, and she assumed sole responsibility for the mortgage. In the fall of 2008, Ms. Fraser's oldest son was diagnosed with lymphoma, and he began treatment for the cancer at Siteman Cancer Center in St. Louis, Missouri. The drop in her personal income and unexpected costs related to her son's illness caused Ms. Fraser to make inquiries about potential home retention and loan modification programs, including the "Hope for Homeowners" program.

74.     In December of 2008, Ms. Fraser contacted Countrywide Home Retention Department, and was advised that in order to qualify for a modification of her loan, she would have to be three months behind on her mortgage, but not be in bankruptcy. Following instructions from the Countrywide/Bank of America representative, Ms. Fraser missed two mortgage payments in late 2008 and early 2009, and began receiving notices that her loan was in default. Ms. Fraser contacted Countrywide Home Retention again in February of 2009, seeking further guidance on her ability to qualify for a loan modification. At this time, Ms. Fraser was advised that the criteria for modification were loss or reduction of income, a change in household status affecting income, and a catastrophic life event or serious family illness. Ms. Fraser provided the company with all of her financial information, and was told that she would qualify for the modification. Countrywide told Ms. Fraser that she would be provided with an application packet.

75.     In March of 2009, Ms. Fraser contacted Countrywide because she had not received her loan modification packet as promised. Ms. Fraser was told that her file was being "studied," although she explained that she had been given prior assurances that she clearly qualified for the program. Ms. Fraser began receiving frequent loan default notices and foreclosure threats. Between March and June of 2009, this pattern continued, with Ms. Fraser making inquiries about the promised application packet (but receiving nothing) and getting continued threats of foreclosure.

76.     In early June of 2009, Ms. Fraser contacted Bank of America[7] to continue her inquiries about the missing application packet. She was informed by Defendants' representative that, according to on-line records, nothing had been done by Defendants to qualify Ms. Fraser for the loan modification program or to send her an application packet.

---

[7]   Countrywide changed its name to Bank of America Home Loans on April 27, 2009.

77.     On June 16, 2009, Ms. Fraser received a formal Notice of Intent to Accelerate from Bank of America, indicating that foreclosure was imminent, notwithstanding that (a) she had been continuing to make mortgage payments, having missed only two payments and (b) she had been assured that she qualified for Bank of America's home loan modification program.

78.     On July 10, 2009, Ms. Fraser received notice from Bank of America that she might qualify for the HAMP program.  The next day, she received a loan modification agreement from Bank of America.  Ms. Fraser understood this to be the HAMP program documents that Bank of America had been promising for nearly five months.  Ms. Fraser completed the loan modification contract, had it notarized, and returned it to Bank of America by Federal Express on August 6, 2009.  In a subsequent conversation with Bank of America, Ms. Fraser was assured that (a) her two prior missed payments had been factored into the new, modified loan contract and (b) her first payment of the new monthly amount would be due in October of 2009.

79.     Between August of 2009 and July of 2010, Ms. Fraser made numerous, periodic calls to Bank of America to check on the status of her modified loan.  Each time, she was assured that the her executed load modification agreement had been received and was being processed, and that she should ignore her monthly statements to the extent they showed (a) the old monthly payment amount or (b) that her loan was in default. Bank of America also told her to continue to pay the new, modified monthly loan amount; Ms. Fraser complied, continuing to make monthly payments of the new, modified loan amount.

80.     In the summer of 2010, Ms. Fraser learned for the first time that her credit rating had been severely impacted due to her mortgage being in default.  Specifically, Ms. Fraser tried to purchase a refrigerator at a local department store, she was denied the opportunity to do so through access to the store's credit card.  Later, when she tried to act

as a co-signer for her son on an apartment lease, she was again denied because of a poor credit rating owing to her mortgage reportedly being in default. Ms. Fraser was shocked and dismayed, as she had been paying her modified loan amount consistently. The apartment situation was especially troubling, as her son, recovering from cancer, was just getting back on his feet. Ms. Fraser contacted one of the three credit reporting agencies regarding her credit score, and learned that her "delinquent mortgage" had dramatically and adversely affected her credit rating.

81.     In July of 2010, Ms. Fraser had a conversation with Alina Aqeel, a Bank of America loan negotiator. Ms. Aqeel apologized to Ms. Fraser, stating that mistakes had been made by Bank of America on "a whole batch" of loan modifications. Ms. Aqeel assured Ms. Fraser that her 2009 loan modification had been approved, but that because of Bank of America's "errors," a new loan modification contract would have to be completed and executed. Ms. Fraser complained about the negative impact on her credit rating, and was told by Ms. Aqeel that a "credit correction" letter would be sent out within days, and that Ms. Fraser's credit would be corrected retroactively.

82.     On July 12, 2010, Ms. Fraser received a second loan modification from Bank of America by Federal Express. Ms. Fraser immediately completed the paperwork, had it notarized at the Bank of America branch in Troy, Missouri, and returned it to Bank of America by placing it in a Federal Express package on July 16, 2010.

83.     Since the time that she returned the second loan modification to Bank of America, a disturbingly familiar pattern has re-emerged. Ms. Fraser continues to pay the modified monthly loan amount (per the second loan modification agreement), but continues to receive monthly statements that (a) reflect an incorrect monthly amount and (b) indicate that her mortgage is in default. Finally, Ms. Fraser has never received a "credit correction" letter, and her credit rating continues to be adversely impacted, as a direct result of Bank of America's misconduct.

84.     Despite compliance with all of Bank of America's instructions, and all responsibilities under the terms of the HAMP program directives, Ms. Fraser has not been provided with confirmation that she her loan modification contract has been accepted and implemented.

85.     Ms. Fraser has spent significant time and money in efforts to modify this loan with Bank of America including but not limited to, dozens of hours on the telephone, express mail, postage and fax fees.  The negative impact on Ms. Fraser's credit has been devastating -- a source on of constant, significant anxiety and frustration -- and has severely limited her ability to help her son as he continues to recover from cancer.

86.     Like hundreds or even thousands of Missouri residents, Ms. Fraser has been living in limbo, without any assurances that her home will not be foreclosed on, despite compliance with HAMP requirements and continued monthly payments under the agreement dictated by Bank of America.  She has invested her limited resources in modified payments based on the promise that doing so would result in a permanent loan modification.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

87.     The applicable statutes of limitation are tolled by virtue of Defendants' knowledge, active concealment, and denial of the facts alleged herein. Plaintiff and the Class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.  Plaintiff and the Class members could not reasonably have discovered Bank of America's misconduct, delay, obstruction and hinderance of the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States.  Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan

modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

88.     Defendants are and were under a continuing duty to disclose the true character, quality and nature of their loan modification processes to Plaintiff and the Class members.  Defendants are therefore estopped from relying on any statute of limitations defense because of their concealment of the true character, quality and nature of their loan modification processes.

## COUNT I

## BREACH OF CONTRACT / BREACH OF DUTY
## OF GOOD FAITH AND FAIR DEALING

89.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

90.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

91.     The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiff and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiff and the Class.

92.     By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

93.     Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

94.     In addition to duties to Plaintiff based on their status as third-party beneficiaries of the SPA, Bank of America entered into an individual contract directly with Plaintiff.

95.     The Agreement sent by Bank of America to Plaintiff constitutes a valid offer.

96.     By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiff accepted Bank of America's offer.

97.     Alternatively, Plaintiff's return of her loan modification agreement constitutes an offer.  Acceptance of this offer occurred when Bank of America accepted Plaintiff's modified loan payments.

98.     Plaintiff's modified loan payments to Bank of America constitute consideration.  By making those payments, Plaintiff gave up the ability to pursue other means of saving her home.

99.     Plaintiff and Bank of America thereby formed a valid contract.

100.     To the extent that the contract was subject to a condition subsequently providing Bank of America an opportunity to review the documentation submitted by Plaintiff when she returned the signed loan modification contract, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiff's claims.

101.     By failing to offer Plaintiff a permanent HAMP modification, Bank of America breached its contract with Plaintiff.

102.     Bank of America routinely and regularly breaches its duties under both the SPA and its contract with Plaintiff and members of the class by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate

loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiff's eligibility for HAMP; and failing to follow through on written and implied promises.

103.    Plaintiff remains ready, willing and able to perform under the contract by continuing to make modified loan payments and provide documentation.

104.    Plaintiff has suffered harm and is threatened with additional harm from Bank of America's breach.  Plaintiff's credit has been damaged, and continues to be damaged, by Bank of America's misconduct.  By making modified loan payments, Plaintiff foregoes other remedies that might be pursued to save her home, such as restructuring her debt under the bankruptcy code, or pursuing other strategies to deal with any default, such as selling her home.  On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II

## PROMISSORY ESTOPPEL

105.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

106.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

107.    Bank of America made a representation to Plaintiff that if she returned the loan modification contract executed and with supporting documentation, and made her modified loan payments, she would receive a permanent HAMP modification.

108.    Bank of America's loan modification contract was intended to induce Plaintiff to rely on it and make modified monthly loan payments.

109.     Plaintiff did, in fact, rely on Bank of America's representation, by submitting modified monthly loan payments.

110.     Given the language in the loan modification contract, Plaintiff's reliance was reasonable.

111.     Plaintiff's reliance was to her detriment.  Plaintiff has yet to receive permanent HAMP modifications and has lost the opportunity to fund other strategies to deal with any default and avoid foreclosure.

## COUNT III

## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT

112.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

113.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

114.     The loan modification services as described herein were provided by Defendant to Plaintiff and the Class primarily for personal, family or household purposes.

115.     The loan modification services performed by Defendants constitute "merchandise in trade or commerce" as defined by R.S.Mo. § 407.020.1.

116.     Because of, among other things, their superior access to information, Defendants had a legal duty to inform their customers that their loan modifications were not being performed in conformity with the obligations that Bank of America contractually undertook when it accepted billions of dollars from the United States.

1.      117.     Defendants, through their employees, agents and representatives, have engaged in acts, methods or practices of deception, fraud, false pretense, false promise,

misrepresentation, unfair practice or the concealment, suppression or omission of facts in connection with providing loan modification services and thereby violated the Missouri Merchandising Practices Act, all by, among other things:

    a.    Concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implement and administer the HAMP program;

    b.    Routinely failed to meet their obligations under their agreements to provide loan modification services;

    c.    Routinely forcing mortgage borrowers who request to be evaluated for a modification face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information;

    d.    Routinely forcing borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and be transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call;

    e.    Regularly falsely informing borrowers that they did not receive requested information and demanding that documents be re-sent; and

    f.    Routinely and serially stringing out, delaying, and otherwise hindering the loan modification processes that Bank of America contractually undertook to facilitate when it accepted billions of dollars from the United States.

118.    As a direct and proximate result of Bank of America's deception, fraud, false pretense, misrepresentation, unfair practices and/or concealment, suppression or omission of material fact as alleged herein, Plaintiff and the Class were induced to employ Defendant for loan modification services and had their financial welfare endangered.

119.    As a direct and proximate result of Bank of America's conduct as described herein, Plaintiff and the Class had loan modification services performed in such a manner as to put their personal financial welfare at risk and have otherwise been damaged.

120.    The conduct of Bank of America as set forth herein constitutes unfair or deceptive acts or practices, including its practice of leading borrowers to believe that it will permanently modify their mortgage loans upon successful completion of a trial program.

121.    Bank of America's conduct as set forth herein has been unfair in violation of because the acts or practices violate Missouri Merchandising Practices Act, Missouri Revised Statutes, Chapter 407, established public policy, and because the harm they cause to consumers in Missouri greatly outweighs any benefits associated with those practices.

122.    Bank of America's conduct as set forth herein resulted in loss of money or property to Plaintiff and Class members.

123.    Defendants at all times acted intentionally, maliciously, willfully, outrageously and knowingly.  The conduct reflects a deliberate indifference to Plaintiff's rights, entitling Plaintiff and the Class to an award of punitive damages.

## COUNT IV

## UNJUST ENRICHMENT

124.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

125.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

126.    Plaintiff and the Class conferred a benefit upon Defendants by paying for loan modification services, which provided Defendants with a stream of revenue from the provision of their services.

127.    By concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implement and administer the HAMP program, Defendants failed to provide the loan modification services they purported to provide, thereby making the retention of the financial benefit conferred by Plaintiff and the Class unjust.

128.    Defendants, through their employees, agents and representatives, have engaged in acts, methods or practices of deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression or omission of facts in connection with providing loan modification services including, among other things:

      a.   Concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implement and administer the HAMP program;

      b.   Routinely failed to meet their obligations under their agreements to provide loan modification services;

   c.   Routinely forcing mortgage borrowers who request to be evaluated for a modification to face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information;

   d.   Routinely forcing borrowers who attempt to contact Bank of America by telephone to face long periods of time on hold and be transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call;

   e.   Regularly falsely informing borrowers that they did not receive requested information and demanding that documents be re-sent; and

   f.   Routinely and serially stringing out, delaying, and otherwise hindering the loan modification processes that Bank of America contractually undertook to facilitate when it accepted billions of dollars from the United States.

129.    Nevertheless, Defendants appreciated and retained the benefit conferred by Plaintiff and the Class, which is unjust, unfair and inequitable, in the circumstances described herein.

**COUNT V**

**FRAUDULENT OMISSION**

130.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

131.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

2.    132.   Because of, among other things, their superior access to information, Defendants had a legal duty to inform their customers of all material facts regarding their loan modification services.

133.   By concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implement and administer the HAMP program, Defendants failed to provide the loan modification services they purported to provide, thereby making the retention of the financial benefit conferred by Plaintiff and the Class unjust.

134.   Notwithstanding said duty, Bank of America failed for provide Plaintiff and the Class with all material facts in connection with its loan modification services, including the following material omissions:

  a.   Concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implement and administer the HAMP program;

  b.   Concealing from customers that Defendants were failing to meet their obligations under their contractual agreements to provide loan modification services;

  c.   Concealing from customers that they were routinely forcing mortgage borrowers who requested to be evaluated for a modification face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information;

    d.  Concealing from customers that they were routinely forcing borrowers who attempted to contact Bank of America by telephone face long periods of time on hold and be transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call;

    e.  Concealing from customers that they were regularly falsely informing borrowers that they did not receive requested information and demanding that documents be re-sent; and

    f.  Concealing from customers that they were routinely and serially stringing out, delaying, and otherwise hindering the loan modification processes that Bank of America contractually undertook to facilitate when it accepted billions of dollars from the United States.

135.    The omitted information was not available to Plaintiff and the Class, and it was beyond their reasonable reach and not discoverable by them in the exercise of reasonable diligence.

136.    The omitted information was material, Defendants knew of its falsity, and intended that Plaintiff and the Class act on the omitted information in a manner reasonably contemplated.

137.    As a direct and proximate result of Defendants' omission of the material information referenced herein and Plaintiff and the Class' reasonable reliance thereon, Plaintiff and the Class were provided loan modification services in such a manner as to put their personal financial welfare at risk, including damaging their credit and subjecting them to the possibility of foreclosure, and have otherwise been damaged.

138.    Defendants' conduct in concealing and omitting the information was outrageous due to its evil motive and reckless indifference to the rights and financial

welfare of Plaintiff and the Class, justifying an award of punitive damages in an amount sufficient to deter Defendants and others from similar conduct.

## COUNT VI

## NEGLIGENT OMISSION

139. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

140. Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

141. Defendants had a legal duty to advise its potential and actual customers of the manner in which it intended to have their loan modification services provided.

142. Notwithstanding said duty, Bank of America failed to advise its potential or actual customers of the deficient nature of the manner in which it provided its loan modification services as described more fully herein, and were thereby negligent.

143. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class were provided with information regarding Bank of America's loan modification services that was false, omitted important information, and/or was highly misleading.

144. Plaintiff and the Class were ignorant of the true facts regarding Defendants' loan modification services through no fault of their own, and were entitled to rely upon Defendants' characterization of their loan modification services.

145. The negligent omissions were material in that they induced Plaintiff and the other class members to obtain loan modification services offered by Defendants and to have these loan modification services administered by Defendant.

99261.1

146.    As a direct and proximate result of Defendants' negligent omissions, Plaintiff and the Class were provided loan modification services in such a manner as to put their personal financial welfare at risk, including damaging their credit and subjecting them to the possibility of foreclosure, and have otherwise been damaged.

## COUNT VII

## DECLARATORY JUDGMENT SEEKING INJUNCTIVE RELIEF

147.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

148.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

149.    Plaintiff and the Class are entitled to a declaration of the Court that the actions and pattern of conduct by Defendants as alleged herein are unlawful.

150.    As a direct and proximate result of Defendants' wrongful conduct as described herein, Plaintiff and the Class were provided loan modification services in such a manner as to put their personal financial welfare at risk, including damaging their credit and subjecting them to the possibility of foreclosure, and have otherwise been damaged.

151.    Accordingly, Plaintiff and the Class are entitled to a declaration that Defendants' actions and pattern of conduct as alleged herein was unlawful.

152.    Additionally, this Court should issue prospective injunctive relief enjoining Defendants from continuing their improper practices, and compelling them to conduct an audit of their existing customer base to ensure that loan modification services are performed in accordance with Bank of America's contractual obligations, as well as state and common law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.      Certify this case as a class action and appoint the named Plaintiff to be Class representative and her counsel to be Class counsel;

B.      Enter a judgment declaring the acts and practices of Bank of America complained of herein to constitute an unlawful business practice, in violation of state and common law, and further declaring that they are required to offer permanent modifications to Plaintiff and the members of the Class;

C.      Grant a permanent or final injunction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class;

D.      Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.      Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

F.      Reduce the amount of indebtedness of Plaintiff and each Class member by the amounts Defendants have wrongfully claimed to be owed due to payment amounts, interest and fees, that do not comply with HAMP or with contracts directly with Plaintiff or Class members;

G.      Award restitution, as well as actual and statutory damages, to the Plaintiff and the Class in amounts to be proven at trial;

H.      Award Plaintiff and the Class punitive damages to address Defendants' intentional, malicious, willful, outrageous, knowing conduct and deliberate indifference to Plaintiff's rights;

I.      Award Plaintiff the reasonable costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

J.      Grant Plaintiff and the Class such other and further relief as this Court deems necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:  December 22, 2010                    Respectfully submitted,

                                             /s/ Michael J. Flannery_____
                                             Michael J. Flannery,
                                             ED MO Bar # 110084
                                             CAREY DANIS & LOWE
                                             8235 Forsyth Boulevard
                                             Suite 1100
                                             St. Louis, MO  63105
                                             Telephone:  (314) 725-7700
                                             Facsimile: (314) 721-0905
                                             e-mail:  mflannery@careydanis.com

                                             *Attorneys for Plaintiff*

99261.1                                      38